EMMA HOLTMAN, ADMINISTRATRIX, ET AL., APPELLANTS, V. ALBERT LALLMAN ET AL., APPELLEES.

FILED DECEMBER 31, 1931. No. 27311.

184

*Abbott, Dunlap & Corbett* and *O'Hanlon & O'Hanlon*, for appellants.

*A. C. Debel* and *Maher & Carrigan, contra.*

Heard before GOSS, C. J., DEAN and EBERLY, JJ., and RAPER and RYAN, District Judges.

RAPER, District Judge.

This is a suit to set aside a deed to 240 acres of land in Washington county, made by August Lallman, deceased, to his son Albert and to recover rents and a sum of money

from Albert, on the grounds of mental incompetency of grantor and undue influence exerted by Albert. The trial resulted in a general finding and decree for defendants.

August Lallman died on June 17, 1928, leaving the following heirs: Emma Holtman, a daughter; William Lallman, a son; Mary Lallman, a daughter; Albert Lallman, a son; and Florence and Mabel Langhorst, daughters of Lizzie Langhorst, a deceased daughter. This action was brought by Emma Holtman as an individual and as administratrix of the estate of August Lallman, deceased, and Florence and Mabel Langhorst, as plaintiffs, against William, Mary and Albert Lallman defendants.

The petition alleges that August Lallman died intestate, and the deceased, from and after 1923, by reason of old age, and physical weakness and mental incompetency, was unable to understand or transact business, and that by reason of said incompetency, and undue influence, Albert obtained a deed from his father on April 16, 1924, to 240 acres of land, being all the land he owned; that the deed reserved a life estate in the grantor, and that Albert owed his father rent for the land for the years 1924 to 1928, inclusive, and that on January 19, 1928, Albert wrongfully converted to his own use money of his father in excess of $7,000. William and Mary did not answer. Albert's answer denies the alleged mental incompetency of his father, and denies any undue influence, alleges the deed was a gift, as was the money, which was obtained in January, 1928, and pleads statutes of limitation as to deed and all rent prior to 1926, and alleges that he paid his father for all the rent.

The deceased and his wife lived on the land in controversy for many years, and accumulated considerable property. The deceased daughter and Emma Holtman had married and left the home many years ago. William, Mary and Albert remained at home continuously with the parents. Albert married in 1920 and brought his wife to the home. William and Mary never married. The family relation appears to have been friendly until after the death

of the father. He died June 17, 1928, at the age of 89 years; the wife died in 1927. The petition alleges that William and Mary were mentally incompetent, but the only testimony to substantiate that was a statement by the witness Schoettger that, about 15 years ago, August told him that Albert was the only one there (at the home) capable of taking care of the business. However, William was called as a witness for the defense, and it is in evidence that he had a substantial account in a bank and that he sold some land to Albert. Mary did not testify. Albert began writing checks on his father's bank account in 1916, or 1917, and from that time wrote all the checks and had full management and control of the farm and his father's business affairs, and Albert received all proceeds from the farm since 1917. Under this situation the presumption is against the validity of the deed and the alleged gift of money and rent, and it devolved upon Albert to show that the father had sufficient mental capacity to make such conveyance and that his acts were free and voluntary and free from undue influence. *Gibson v. Hammang*, 63 Neb. 349.

This being a trial *de novo,* the rulings of the trial court in refusing to admit much evidence that should be before us is unfortunate. The parties were unduly limited in the admission of proper testimony, and in cross-examinations, particularly in the cross-examination of Albert, and counsel on each side were not diligent in offering much that might aid. In such cases a full disclosure of the properties, advancements, conduct of the parties and family situation should be permitted.

The testimony as to mental incompetency of the father is quite contradictory, but it is in proof that as early as 1902 the father had begun to fail very appreciably in his memory, so that he at times would not recognize his daughter and his grandchildren, and had attacks of illness, and that particularly after the fall of 1923 he conversed very little, except he would talk more freely of things that had happened in Germany where he was born, and on one or

two occasions he wandered away and became lost, and in 1921 at one time could not remember that Albert was married, and in the spring of 1921 he complained to a son-in-law that his money was all gone, and inquired if the son-in-law knew anything about some bonds and stamps, that he, August, had lost them, and when oats were four inches high, asked the son-in-law when he was going to cut them, and that he was physically getting weaker; that in 1923 the deceased could not remember a debt that was owed to him by Edward Langhorst, the husband of the deceased daughter, and witnesses testified that August was incompetent during 1923, and ever since till death. These are a few of the incidents referred to in the testimony to indicate that his memory and mind were at least very weak. On the other hand, defendants' witnesses testify that the father's mind at all times, except during a period of illness in the fall of 1925, was clear, and he was competent.

On the 16th of April, 1924, Albert went to Arlington, and brought to the home Mr. Schoettger, the president of the bank, where August had for many years transacted business. Albert testifies he got Mr. Schoettger at his father's request. At the home Mr. Schoettger testifies that August told him he had divided all his property with the girls and did not think it was any more than right that he should make deeds to the land he had to the boys, and that he wanted to retain a life estate, or the use and occupancy of the premises for himself and wife during their lives, and the deed to the 240 acres was so drawn and there read, signed and acknowledged by August and his wife and given to Mr. Schoettger, who afterwards gave it to Albert, and it was recorded the next day. It further appears that August told Schoettger that he wanted to deed the 240 acres to Albert and a 120-acre tract to William. The court refused to permit witness Schoettger to answer about the second deed. August at that time owned no real estate other than the 240 acres. Albert and William and the mother were present, but made no effort to correct the father about his not owning 120 acres, a very curious over-

sight. The land at that time was worth $250 an acre. As to what the father said about having divided up all his property with the girls, there is no evidence that Mary ever received any. Mr. Langhorst testified that the' father told him in 1923, after Mrs. Langhorst's death in August of that year, speaking of a $2,000 loan, which witness offered to pay at that time, "let it go, and let that go for the girls," and said the girls are going to get some more money; and Mr. Langhorst further testified that, after his wife's death and before he talked to the father about the $2,000 loan, Albert came to him and said: "Father sent him over to tell me that since Lizzie (the deceased daughter) died Florence and Mabel were to have the money that Lizzie was to receive, now since Lizzie was dead." Albert did not deny this. Four witnesses besides Albert testified that August had stated at different times 10 or 15 years before his death that Albert was to have the farm. These statements are weakened materially, for it is shown that Mr. Lallman had a will in existence at the time the deed was made, which devised the farm to Albert, but provided that Albert should pay the girls the difference. This was a statement that Mary made to Mr. Langhorst. The court would not permit Albert to be questioned about the will. After the death of the father, Mr. Langhorst and Emma and Edward Holtman went to the home of Albert and inquired about the father's property. Albert became enraged and swore at them and threatened Holtman with a chair and told them it was none of their damned business, and when asked about the will said it was destroyed, and it was none of their damned business who destroyed it. Albert did not deny this. Albert's deposition was taken in March, 1930. This case was tried in January, 1931. In that deposition Albert testified that in March, 1928, he burned his father's will by his father's order. There is no evidence aside from the above statement as to the contents of the will. The inference may be drawn that it was to Albert's interest to have the will destroyed. Albert never told any of the plaintiffs or their families that he had a deed to the

farm and they testified they did not know of the deed until after the father's death. While there are many suspicious circumstances connected with the making of the deed, Mr. Schoettger testified directly to the father's competency; the mother and brother, William, were there; and we find that under all the circumstances shown the deed should stand. It will be unnecessary to determine the question of the statute of limitations.

After the deed was made Albert made improvements on the place, paid the taxes and insurance, and paid the living expenses of all the family, and claims that the support was pay for the rent, and that no rent was demanded and the acquiescence of the father confirms his right to the rent. Under some circumstances this might be conclusive, but under the situation here it has but little force. Celia, Albert's wife, testified that in the fall of 1921 August told her in Albert's presence that Albert would not have to pay any more rent. Albert does not confirm this. In the March deposition he stated that before the deed was signed his father had not said anything about the use of the land. In 1921 the father stated to the Holtmans that Albert was to pay him rent and he could live on that, as he was then planning to move to the Holtman place. Albert claimed to have rented the place for 1921, and produced a check payable to his father as proof of payment for that year, but the father's bank account did not show such deposit, and Albert admitted he received all the proceeds from the farm since 1917. At the trial Albert testified that his father took an interest in the farm affairs and discussed them until about the time of his death, but in the deposition he testified that his father did not talk over farm affairs or business for five or six years before his death. As before stated, it may be doubted whether the father from 1923 was able to carry on business transactions generally; his great age and weakening powers were having a material effect. He no doubt was a man of acquisitive habits, and it is improbable that he would willingly and knowingly divest himself of all his personal property, and the impli-

cation naturally arises that some influence intervened outside of his own will, even if he was competent, to have him yield all of his property to Albert. As to the expense of keeping the family, Albert testified that he did not pay his father any money, outside of the expense of the family. William lived with them and worked as a farm hand, presumably a healthy man, and Albert paid him $50 a year. Mary worked in the fields and helped with the housework and received no pay except her clothes and board. In addition to the income from the farm, Albert received large sums checked out of his father's bank account. Deposits in August's bank account from 1920 to 1927, inclusive, were about $3,300, and in addition to that Albert received $750 in Liberty bonds and a $500 check from his father in 1919, making about $5,000, exclusive of the sum of $7,849 hereafter referred to. No authority for these are proved except Albert's statement that all the checks he gave were by his father's direction. He offered no proof of the amount of taxes paid. Albert has not sustained the burden of proof as to his payment of the rent, nor his right to withhold it. The plaintiffs do not ask for rental before 1924. He will be charged with $1,920 yearly rent for the years 1924 to 1927, inclusive (the rental value was proved to be $8 an acre), with interest on each year's rent from March 1 of the succeeding year. The father died in June, 1928, and Albert is not chargeable with the rent for 1928, and having failed to prove the amount paid for taxes he is not entitled to a set-off for that.

The other remaining item claimed by plaintiffs is the sum of $7,849, of which amount it is alleged $5,142.12 was drawn by Albert from the bank account of the father in January, 1928. Deceased's bank account shows a deposit on October 21, 1927, of $7,849. Checks for about $1,810 were drawn against it between October 21 and December 13, 1927, leaving a balance of $6,142.12. On January 19, 1928, a check in Albert's favor signed "Aug Lallman by A. L." was charged to the account. Albert testified that his father gave him this sum and reserved the $1,000 bal-

ance in the bank to pay for funeral and church subscription. There is nothing to show from what source the $7,849 deposit came.

Plaintiffs do not ask for the sums checked out in December. Mr. Schoettger wrote out the check for Albert at the bank and Albert signed it and took the proceeds. Mr. Schoettger said that about a month after that he went to see Mr. August Lallman about the check and asked Mr. Lallman if it was all right and Mr. Lallman replied: "Sure it was or I would not have told you to let him (Albert) take care of my account I had there." Mr. Schoettger says that William, Albert's wife, and, he thinks, Albert were there, but none of them testify to this conversation. Albert testified that no one was present when his father told him to take the $5,142, and they had only the one conversation about it, and that was on the day the check was given. Celia, Albert's wife, testified that in December, 1927, she heard the father tell Albert that he should have all the money in the bank but $1,000. Albert never told plaintiffs or their families anything about the moneys he received, or any of his dealings with his father. Albert's testimony at the trial was flatly contradictory to the testimony given in his deposition in many important facts and but little credence can be given to his testimony. Mr. Schoettger may not be entirely disinterested, and even if, at a short visit he made, the deceased appeared then to understand, he would not be in position to know about any influence that may have been previously imposed on this 89-year-old man, and it will be remembered that Albert took care to be present. The situation in regard to this $5,142 is in some respects similar to *Chamberlain v. Frank*, 103 Neb. 442, where it is said that a conveyance made by one well stricken in years, living under such circumstances as to place him under the control and domination of a son, will be closely scrutinized, and when from the evidence, or lack of evidence, the court is satisfied either that the grantor was incompetent to transact business of that nature, or that his mind was so overborne by influences which in its

weakened state it was unable to resist, and that he made the conveyance disregarding the natural affection to his other children, and which he would not have made if uninfluenced, or that a combination of both weak mentality and undue influence existed, it will set aside the conveyance.

In this case there is no direct evidence of undue influence exerted upon the deceased, but under all the evidence we have reached the conclusion that August Lallman was in such condition of mind at the time of the alleged gift of the $5,142.12 as not to have been a free agent. There may be doubt as to whether the father did give it. We find that plaintiffs are entitled to recover that sum from Albert, with interest at 7 per cent. per annum from January 19, 1928. The plaintiffs ask no recovery for the $1,000 balance, as it was used for funeral and other expenses.

The plaintiff Emma Holtman, as administratrix of the estate, is entitled to judgment against Albert Lallman for the rent, to wit: $1,920 with interest at 7 per cent. from March 1, 1925; $1,920 with interest at 7 per cent. from March 1, 1926; $1,920 with interest at 7 per cent. from March 1, 1927; $1,920 with interest at 7 per cent. from March 1, 1928; also the sum of $5,142.12 with interest at 7 per cent. from January 19, 1928. The decree of the district court is reversed and the cause is remanded, with direction to enter judgment as above stated, and to confirm the deed to the 240 acres.

REVERSED.