MAY LENA F. SCOTT, APPELLEE, V. EMMA SWANK, APPELLANT.

273 N. W. 25

FILED MAY 7, 1937.   NO. 29887.

*Ferneau & Ferneau, Raymond B. Morrissey, Hugh La Master* and *Sidney S. Stewart,* for appellant.

*Charles A. Dafoe, Harry K. Livingston* and *Armstrong & McKnight, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

ROSE, J.

This is a suit in equity to cancel a deed to a 160-acre farm in Johnson county, Nebraska, on the grounds of grantor's incompetency and of duress by grantee and her agent. The district court canceled the deed and defendant appealed.

The appeal requires a trial *de novo* on the record made in the district court. Plaintiff, May Lena F. Scott, is the adopted daughter of Noah Swank, who was twice married, and his first wife. The Swank family of three, the foster parents and plaintiff, their adopted daughter and only child, formerly resided on the 160-acre farm in Johnson county, but they all moved to Polk county, Arkansas, near Mena, in 1911. Plaintiff was married to George Scott in 1914. Her foster mother died July 22, 1932, and her foster father, Noah Swank, married defendant, Emma Swank, November 16, 1933, and died March 30, 1934. The deed in controversy purported to convey the Johnson county farm from Noah Swank, grantor, who owned it, to his second wife, Emma Swank, grantee, defendant. It was dated March 12, 1934, and recorded in the public records March 30, 1934. It thus appears that the deed to the second wife was signed 3 months and 26 days after the second marriage of grantor and 18 days before his death.

In connection with the facts stated, which are undisputed, the petition contains in detail pleas to the effect that grantor was 79 years old March 12, 1934; that he had been weakened mentally and physically by a paralytic stroke and other infirmities to such an extent as to incapacitate

him for business transactions; that in this condition defendant and her agent procured the deed by duress; that consequently the deed was voidable; that plaintiff, under the Nebraska statute of descent, inherited from her foster father the undivided three-fourths of the 160-acre farm and that defendant inherited the undivided one-fourth of it.

In addition to a general denial of unadmitted allegations in the petition, defendant alleged in her answer that grantor conveyed the title to her in consideration of love and affection while in full possession of his mental faculties and fully competent to transact business; that on March 12, 1934, he was of sound mind and under no restraint, influence or compulsion of any kind. There was a prayer for a dismissal of the cause. The reply to the answer is in the nature of a general denial.

With the pleadings as thus outlined, the district court found the issues in favor of plaintiff after a long trial, and canceled the deed.

What does equity require in view of all the facts and circumstances? The solution of the problem depends on the evidence. The principal task is to ascertain the truth from a record full of contradictions in many respects.

The deed from Noah Swank, grantor, to his second wife, Emma Swank, grantee, was dated March 12, 1934. He had a paralytic stroke in January, or February, 1934, and was unconscious for a short time, required constant care and was never again able to be out of his house. He was confined to his bed most of the time and died March 30, 1934.

An expert in mental diseases testified on behalf of plaintiff, in substance, that he had been grantor's physician for 20 years; treated grantor for Bright's disease for two years prior to his death; patient had high blood pressure, around 200; hardening of arteries; stroke incapacitated him mentally; witness saw grantor two months before he died and had occasion to note his mental condition while treating him for Bright's disease and high blood pressure; mind began to fail about July 1, 1933, and seemed to get weaker; easily influenced; did not have mental capacity to

make a deed before he was stricken and his condition thereafter would be worse.

Another physician testified he attended grantor in January, 1934, and found him unconscious from apoplexy; was unconscious next day when physician again called; saw grantor the day before he died; he was not competent to transact business after he was stricken with apoplexy. In answer to hypothetical questions, other physicians testified to the opinion that grantor was not mentally competent to transact important business or to execute a deed March 12, 1934. Nonexpert witnesses who knew grantor before and after the death of his first wife and after he signed the deed in suit, and who had observed his conduct and condition, expressed opinions to the effect that he changed both mentally and physically after his paralytic stroke and was not mentally competent to execute a deed March 12, 1934. Their testimony contains also statements that Swank, after the death of his first wife, expressed a purpose to leave his property to the Scotts, his daughter and her husband.

Other physicians were produced by defendant, Emma Swank, the grantee. They qualified as experts and testified in her behalf. One of them said, in substance, that he had known grantor about seven years; that he called on him February 15 and 16, 1934, and on March 11, 1934; had conversed with him, but would not say they talked about business; had one little stroke, but was practically over it when witness called; did not think grantor was easily influenced; detected nothing wrong with his mind; mentally same as always—"A-one" every time they met; capable of transacting business when he made his deed. Many nonexpert witnesses were also produced by grantee. In effect they testified to long acquaintance with grantor; to conversations with him; to his business transactions; to observations of his conduct and condition before and after his stroke; to utterances by him that he wanted his property to go to his second wife and not to his adopted daughter or to her husband. Each of these witnesses disavowed any interest in the case. On facts to which they testified they

expressed the opinion that grantor was sound of mind when he deeded his Nebraska farm to his second wife; that he was then mentally competent to transact important business, including the transfer.

Defendant contends there was no clear, satisfactory and convincing evidence of grantor's mental incompetency or of duress to overthrow the duly executed deed and properly adduced testimony of the subscribing witnesses that grantor was of sound mind and competent to transact business, including the making of the deed, March 12, 1934, that date alone being the time for the test of competency or incompetency or of duress.

In determining the issues, the court may resort to material factors found in circumstances under which the deed was prepared, signed and witnessed; to the agencies that directed what was said and done at the time; to the physical and mental condition of grantor and the natural or unnatural effect of the transaction upon the objects of his bounty; to all other features of the proofs. The agreed value of the Johnson county farm was $4,800 and it was the principal part of his estate. The deed, if valid, left the daughter without a substantial inheritance. There is no evidence of any hostility on the part of grantor toward his daughter before the second wife and the latter's agent and confidential manager, Grant Oster, appeared on the scene. This agent, who was also attorney in fact for both grantor and grantee, declared his intentions and purposes, after the death of the first wife but before the second marriage and before the making of the deed, to one or more disinterested witnesses, according to their testimony, which may be condensed as follows: The old man did not have mentality enough to transact his own business; "I am going to take charge of what he has got and attend to it for him" and "he is going to pay me for everything I do; he has got the money and I just as well have it as anybody else." He ought to marry and get somebody to take care of him. "She (adopted daughter) will just get $5 willed to her." Further: "Was going to run the business;" that Swank

"wanted him to look after the thing." Also, "He was not capable of running his own business" and if "he would advise him he would know how to do things." In addition: "Was going to see that Mr. Scott didn't get anything." A purported will antedated the deed. Referring to Oster, one of the disinterested witnesses testified:

"He said Mr. Swank wanted him to write the will and that they 'had got it wrote' and probated and put on record, and said May didn't get anything but would just get $5 willed to her; said 'she wouldn't get fat on $5.' "

Oster as a witness denied the truth of this testimony, but other evidence shows clearly that he proceeded to carry out his declared purposes and intentions, as related by witnesses, and that defendant, the second wife, participated directly and actively in his plans. December 23, 1933, 37 days after the second marriage, Oster prepared and Swank and defendant, his second wife, signed what purported to be their joint will, each giving to the survivor all property of every kind belonging to either, naming the survivor as executor or executrix until the death of both and nominating Oster to be sole executor thereafter. The second paragraph of this instrument reads thus:

"After the death of both of us, it is our will, and we do hereby bequeath, devise and give our daughter, May Scott, of Mena, Ark., the sum of Five Dollars to be paid to her out of our estate after the death of both of us; and it is our will, and we bequeath all the remainder of our estate, one-half divided equally to J. B. George and R. G. George, and the other one-half to Mrs. Rebecca Hoover."

This purported will was drawn by Oster and executed with the same formality and solemnity as the later deed now in controversy, both with practically the same end in view—termination of the rights of the daughter, as legal heir. Defendant had no property to bequeath at the time of joining in this will. She had not contributed anything to her husband's estate, but plaintiff had been grantor's daughter from infancy to womanhood and had aided him in his farming operations on this very Johnson county

farm. She had taken care of his first wife in her last illness. The probate court and the circuit court of Polk county, Arkansas, and a jury found that this will was void and defendant herself testified it was thrown out.

Swank and his first wife had bound themselves by oath to adopt Lena Ferguson by the name of May Lena F. Swank with the status of a natural heir, including property rights. They procured a decree of adoption containing the same conditions and declaring that the child should have the same legal rights, privileges, immunities and heirship as if born to her foster parents in lawful wedlock.

It is a proper inference from all evidential facts and circumstances that Swank had the mentality and independence to respect his oath and his properly assumed and natural obligations to his daughter until he was mentally and physically weakened by paralysis and other infirmities and until he fell under the influence of Oster and the second wife. He was not with either of them when procuring his marriage license but went alone and accepted a license to marry "Annie Ferguson" instead of "Emma Ferguson." The law presumes, in absence of evidence, that the licensing officer performed his duty, but defendant testified that Swank knew her name and she attributed the error to some officer without disclosing personal knowledge of the fact.

Defendant, the second wife, gave her age as 64. She had been married three times before becoming the wife of Swank, whom she had known but three or four months. She admitted her marriage to him occurred in Arkansas about a month after she was divorced from a former husband. On the witness-stand she said that she married Swank to take care of him; that she was married at her brother's home in Mena where she remained thereafter for three weeks, but that she had a sore foot and could not then do any work; that her new husband had a little spell with his heart but was able to walk from his home in Mena to his little farm—40 acres just beyond the city limits; that Oster helped her to move her goods from her brother's

home to the little farm. The evidence tends to prove that Oster, in addition to his powers of attorney, kept in a box in his own home papers belonging to both Swank and his new wife; that he transacted business for both; that he had been with Swank in the latter's home every day from the date of his stroke until his death, remaining for two hours or more at different times; that he had made trouble between Swank and his son-in-law; that Swank feared the latter meant to poison him; that the Scotts sent fresh meat to Swank by neighbors to whom it was returned with a warning of poison; that the neighbors ate and relished the same meat without any harmful result.

Before controversy arose between Swank and the Scotts, but after the death of his first wife, he entered into a contract with his daughter to convey to her his 40-acre farm near Mena, worth perhaps $350, on terms permitting him to make his home with them there and obligating them to support him and care for him. Oster did not approve this transaction. Swank became dissatisfied and complained that he had been mistreated by the Scotts. After litigation over the contract was commenced, but before trial, the controversy was settled and the daughter reconveyed the property to her father. Animosity between Oster and Scott arose from minor incidents growing out of a public sale of personal property belonging to Swank. Scott objected to what he considered Oster's interference with his personal affairs. There is nothing in the record, however, to justify the fear of an attempt by Scott to poison Swank or to change the natural attitude of the father toward his daughter. Fear and hostility were obviously created by delusions or by external influences which controlled him.

The deed, like the disinheriting will, was drawn, signed and witnessed without notice to or knowledge of the daughter, who had been turned from her father's door two or three days before he died. She was not notified of his death but found him later at the morgue. Oster was entrusted with the deed and withheld it from public records until the date of grantor's death.

Oster testified to his services in the making of the deed and to the attending circumstances. His version of the transactions and testimony of others present may be condensed to what follows: Swank sent for Oster March 12, 1934, and, after he arrived at the home of the former, told him he was going to deed his Nebraska farm to his wife; that there was a blank deed in his box in Oster's house and a deed containing a description of the farm; gave directions to have the blank deed typed and to bring some one to validate it. Oster got the papers; met W. L. Parker, a notary and attorney, and both men went to the office of Parker, where the deed was prepared by him, except for part of the description of the land. Oster took Parker to the home of Swank the same day. They had access to his bedroom through the kitchen. He was in bed. Parker talked to Swank and told him about the deed. The latter supplied the omitted part of the description. Parker read the deed to him, asked him if that was what he wanted and he said it was. Parker wrote the name of Swank on the deed and made his mark, the latter touching the pen. There were present Oster, Parker, Flora Hardy and Swank. Oster and Flora Hardy signed the deed as witnesses. Parker took the acknowledgment and handed the completed instrument to Swank, who gave it to his wife after she had been called from the kitchen. She immediately gave the deed to Oster who kept it in his house until he sent it to the register of deeds the day grantor died. Swank could not sign his name, though he formerly wrote fairly well. Before he touched the pen held by Parker he said he was "kind of nervous." He talked slowly. It was difficult for some people to understand him. Parker was attorney for grantee, Emma Swank, in another suit involving the same land. Oster was beside the bed. The other subscribing witness, Flora Hardy, was a friend of Emma Swank, was staying with her at the time and had previously been her employee in a former home.

No one would attempt to destroy plaintiff's rights as an heir without intending to use the essential forms of law

and to procure the necessary witnesses for the accomplishment of that purpose. Parker, Oster and Flora Hardy testified to the opinion that Swank was of sound mind and mentally competent to execute the deed. Testimony of this kind and other evidence of a similar import do not, however, determine the issues of incompetency and duress in favor of grantee, as argued in her behalf. In the search for the truth in the interests of justice, courts of equity may look impartially for motives, personal interests and bias behind the forms of the law and beyond any means devised to give evil the appearance of virtue. In the search for the truth, the voiceless story of circumstances about which there can be no reasonable controversy may be more potent than a written deed or oral testimony. Such circumstances, separated from writings and pictures, do not bear on their faces any questionable signatures or import what they are not or commit perjury or shift positions or show bias. The circumstances that Swank, during long years of mental and physical vigor, kept his oath and declared purpose to make plaintiff his daughter and heir and departed therefrom only after he was stricken with apoplexy and after he fell under the influence of his second wife and Oster, in connection with other circumstances already related, show that there was a radical change in his mentality, notwithstanding oral testimony to the contrary. This view is supported by the evidence of his incompetency as disclosed by both expert and nonexpert witnesses called by plaintiff. In the light of the entire record, the making of the deed was not a voluntary act prompted by a competent mind free from restraint. It was unnatural and unreasonable. This is a typical case for the application of the following rules of equity announced in an opinion by Commissioner Pound:

"Although mental weakness may fall short of entire incompetency to transact business, if it is taken advantage of to procure a conveyance by inequitable means, the conveyance may be set aside.

"A court of equity will scrutinize jealously a transaction

as to which there is ground for holding that influence has been acquired over a person of weak mind, and has been abused.

"The circumstances under which a conveyance was made, the condition of the grantor at the time, and the injustice to him and his heirs if it is upheld, may be such as to cast upon the grantee the burden of showing that it is untainted with undue influence, imposition, or fraud, but is the intelligent and deliberate act of the grantor." *Bennett v. Bennett,* 65 Neb. 432, 91 N. W. 409.

These rules of equity have been applied in many cases: *Gibson v. Hammang,* 63 Neb. 349, 88 N. W. 500; *Chamberlain v. Frank,* 103 Neb. 442, 172 N. W. 354; *In re Estate of Noren,* 119 Neb. 653, 230 N. W. 495; *Holtman v. Lallman,* 122 Neb. 183, 239 N. W. 820; *Broeker v. Day,* 124 Neb. 316, 246 N. W. 490.

Defendant did not maintain her burden of proof. On the contrary, there was sufficient evidence to prove both incompetency and duress, which made the deed voidable.

It was insisted in argument that the petition does not allege fraud and that a decree in favor of plaintiff cannot be based on fraud. Plaintiff pleaded duress which is a species of fraud. The ground upon which a contract is voidable for duress is the same as in the case of fraud. 9 R. C. L. 711, sec. 2.

The failure of the district court to grant a new trial on the ground of newly discovered evidence is presented as a ground for reversing the decree below, but the record does not disclose an abuse of discretion in that particular. The independent findings on appeal are the same as the findings of the district court.

AFFIRMED.