ANTON KUCABA, JR. ET AL., APPELLANTS, V. EDWARD KUCABA ET AL., APPELLEES.

18 N. W. 2d 645

FILED MAY 11, 1945. No. 31897.

*Thomas J. Dredla* and *T. R. P. Stocker,* for appellants.

*Joseph Ach,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

WENKE, J.

Anton Kucaba, Jr., Barbara Meyers, Jennie McDonald, Josephine Koranek, Julia Swartz, Rose Baumruker, and the Cicero State Bank, conservator of the estate of Joseph W. Kucaba, incompetent, as plaintiffs, commenced this action in the district court for Saline county against Edward Kucaba, Frances Kucaba, his wife, Cecilia Topel, Alfred Topel, her husband, and Marie Werth, a widow, as defendants.

The purpose of the action is to vacate and set aside a deed from Anton Kucaba, Sr., and Josefa Kucaba, his wife, conveying 160 acres of land located in Saline county to the defendants, Edward Kucaba and Frances Kucaba. The grounds therefor are that the deed was obtained by undue influence, that both grantors were mentally incompetent at the time of their executing the deed and that the signatures attached to the deed are forgeries.

From a judgment for the defendants, Edward Kucaba and Frances Kucaba, sustaining the deed and dismissing the plaintiffs' action, the plaintiffs have appealed.

For the purpose of this appeal the appellants will be collectively referred to as plaintiffs; the appellees, Edward Kucaba and Frances Kucaba, as defendants; Anton Kucaba, also known as Anton Kucaba, Sr., and Josefa Kucaba individually as father or mother and collectively as the parents; otherwise, the parties will be referred to by their respective individual names.

The defendants, Marie Werth and Cecilia Topel, together with the latter's husband, Alfred Topel, were made parties defendant because they refused to join as parties plaintiff. They have no interest in the deed itself. Their only interest is through the estate of the father in case the deed in suit is set aside.

This being an appeal in an equity action the statute requires this court, in determining questions of fact, to reach an independent conclusion without reference to the findings of the district court. However, if there is an irreconcilable conflict therein on a material issue this court will, in determining the weight of the evidence of witnesses who ap-

peared in court to testify, consider the fact that the trial court observed them and their manner of testifying.

The facts in cases of this kind are never completely the same. While many of the cases cited are helpful in determining the issues, because of their similarity, however, the ultimate decision in this case must necessarily be based on the facts thereof.

The parties to this action are all the children of Anton Kucaba and Josefa Kucaba. Seven are plaintiffs and three are defendants. All are competent, except a son, Joseph W., who has been declared an incompetent and appears by his conservator or guardian. Anton, Jr., is the oldest and Edward, who was born in 1902, is next to the youngest.

The parents were of Bohemian extraction. They lived most of their lives either in Chicago or Cicero, Illinois. The father was engaged in many different businesses, among them being that of a contractor, a coal yard operator and a dealer in real estate.

In the spring of 1917 the father sold his coal business and the family moved to Tobias, Nebraska, and lived there until the spring of 1920. They then moved back to Chicago and two years later to Cicero where the parents lived the remainder of their lives. The mother died on May 15, 1934, and the father on June 25, 1939.

Edward lived with his parents until December of 1925. At that time he married and left home. He was gone for about four and one-half years. He returned in 1930. At that time he was a divorcé. He then continued to live there until 1938. On June 11, 1932, he married the defendant, Frances Kucaba, and, at the parents' request, she came into the home very shortly thereafter. At this time the mother was failing in health, due to diabetes, and Frances took care of the home. She also took care of the mother until she died and the father until he was taken to the home of a daughter sometime in 1938.

On August 29, 1933, the parents, by means of the deed in question, purported to convey to Edward and Frances Kucaba the southwest quarter of section 32, township 6 north,

range 1, east of the 6th P. M., in Saline county except for the right of way of the K. C. and Q. R. R. This deed was recorded in the records of Saline county on September 1, 1933. At the time the deed was executed the father was 75 and the mother 73 years of age.

On December 30, 1936, the probate court of Cook county, Illinois, adjudged the father to be incompetent and appointed a conservator or guardian of his estate. Anton, Jr., and Edward were appointed conservators. Subsequently, on May 27, 1937, the Chicago Trust Company of Chicago was appointed their successor and acted in that capacity until the father died. This change was made after Edward prepared an inventory in which he did not list the property here involved and which, because thereof, Anton, Jr., refused to sign.

The first issue necessary for our decision is the question of whether or not the signatures on the deed are forgeries.

On this issue the parties agreed that certain exhibits carried the genuine signatures of the parents. These exhibits were received for the limited purpose of providing a standard for comparison in determining whether or not the signatures on the deed in question are genuine. In this connection the plaintiffs complain that the trial court considered these exhibits for purposes other than that for which they were received.

As stated in *Baxter v. National Mtg. Loan Co.*. 128 Neb. 537, 259 N. W. 630: " 'Evidence which is admitted generally is in the case for any legal purpose for which it is admissible, although the evidence, when introduced, was intended for a particular purpose.' 64 C. J. 137." However, the continuation of this same principle is: "While evidence admitted generally is in the case for any legitimate purpose, evidence cannot be used for another and totally different purpose by the party offering it which is offered and admitted for a limited purpose. Where, by express ruling, it is limited to one purpose, without exception, it cannot be used for another purpose." 64 C. J., sec. 159, p. 137.

The trial court, if the offer is expressly restricted or, by

ruling of the court, is limited in the purpose for which received, should only consider it for that purpose. However, the action of the trial court in considering this evidence becomes immaterial as the case is here *de novo* and we will consider only the evidence that is properly before us, subject to such restrictions and limitations as were properly imposed thereon.

In support of their contention that the signatures are forgeries, the plaintiffs offered the testimony of George W. Schwartz, a handwriting expert from Chicago, Illinois, with 51 years of experience. He analyzed the admitted signatures of the parents and those on the deed in question. He pointed out the distinctions and differences as he saw them and then gave the reasons why, in his opinion, the signatures on the deed here involved are not genuine but forgeries. Edward A. Becker, vice-president of the Continental National Bank of Lincoln, Nebraska, testified that by reason of the fact that his work in the bank required him to identify signatures, he had, over a period of 30 years work, become an expert in handwriting; that he had made a careful examination of the admitted signatures of the parents and those on the deed in question. He analyzed the characteristics and formulation of the letters in the various signatures and then testified that in his opinion the signatures on the deed in question were not genuine but forgeries. Anton Kucaba, Jr., a son and one of the plaintiffs, testified he was familiar with his parents' signatures and that the signatures on the deed were forgeries.

The defendants called Wallace O. Shane of Omaha, Nebraska, a handwriting expert with 40 years of experience. He testified that after an examination and analysis of admitted signatures with those on the questioned deed he was of the opinion the signatures on the deed were genuine and gave the reasons for his opinion. Louis E. Harris of Lincoln, Nebraska, is an expert in the examination and comparison of handwriting with 11 years of experience. He testified that he had carefully examined the admitted signatures and those on the questioned document and in his

opinion the signatures were genuine and then gave his reasons therefor. Cecilia Topel, a daughter, identified the signatures to the deed in question as those of her parents.

While the signature of the mother is not necessary to the validity of the deed, however, since evidence was offered in reference to both, and if the mother's signature was forged it would be a very strong circumstance in connection with the execution thereof, we will consider and discuss them together.

The weight or value of opinion testimony as to handwriting depends largely upon the character of the witness and the opportunity he had of acquiring a knowledge of the handwriting in question together with the cogency of the reasons for his opinion. See 20 Am. Jur., sec. 1210, p. 1062.

Bearing this rule in mind we have carefully considered the testimony of the several witnesses for both sides and have examined the admitted and questioned signatures in the manner suggested by the plaintiffs. In consideration thereof, together with all the facts and circumstances relating thereto as disclosed by the record, we have come to the conclusion that the signatures on the deed in question are the genuine signatures of the parents.

In addition thereto we have the testimony and the certificate of the notary before whom the deed was signed and acknowledged. "Public policy forbids that deeds and mortgages of real estate, duly authenticated in the mode pointed out by statute, should be set aside except upon clear and convincing proof that the certificate of acknowledgment is false. The presumption is in favor of the certificate, and the burden is upon the party alleging such a defense to prove it." *Phillips v. Bishop,* 35 Neb. 487, 53 N. W. 375. See, also, *Thams v. Sharp,* 49 Neb. 237, 68 N. W. 474; *Coe v. Talcott,* 130 Neb. 32, 263 N. W. 596. The testimony of the notary shows that he failed to remember details in connection with the acknowledgment and that he contradicted himself on some matters. However, as a whole, it shows the fact that the deed was signed and acknowledged by the grantors in his presence. The evidence fails entirely to

show by clear, convincing and satisfactory proof that the certificate was false.

The next issue is the question of mental capacity. On this issue the burden of proof is on the plaintiffs, they having so charged, to sustain the lack of mental capacity to make the deed. As stated in *Little v. Curson*, 114 Neb. 752, 209 N. W. 737: " 'Where it is sought to cancel a deed for the want of mental capacity of the grantor to make the instrument, the burden of proof is on the one who alleges the mental incapacity.' *Brugman v. Brugman*, 93 Neb. 408; *Borgmann v. Borgmann*, 110 Neb. 318; *Hitchcock v. Guilliams, ante*, p. 522 (114 Neb. 522, 208 N. W. 630)."

"It is not every weakness of mind arising from old age or sickness, or other causes, that will avoid a deed. There must be a total want of reason or understanding. * * * Mere mental weakness will not authorize a court of equity to set aside an executed contract. * * * In order to vacate a deed on the ground of mental incapacity of the grantor, it is necessary to show such a degree of mental weakness as renders the maker of the deed incapable of understanding and protecting his own interest. The mere circumstance that the mental powers have been somewhat impaired by age or disease is not sufficient, if the maker of the deed still retains a full comprehension of the meaning, design and effect of his act, * * * ." *Brugman v. Brugman*, 93 Neb. 408, 140 N. W. 781.

Both sides offered many witnesses on this issue. They include friends of the parties, friends of the family, relatives, doctors who had attended the parents during the time here involved, neighbors and some of the parties themselves. All of the plaintiffs' witnesses came to the conclusion that the father was not mentally competent to transact business on the day the deed was executed, whereas, all of the defendants' witnesses were of a contrary opinion. Some of the witnesses also testified as to the mother's mental condition on that date.

To set forth the names of all these witnesses and detail their testimony would unreasonably lengthen this opinion

and serve no useful purpose. We have examined their testimony and in determining its value have considered the witnesses' relationship, if any, to the parties; the length of their acquaintance with the parents; the closeness thereof; their interests, if any, in the outcome of the litigation; the purpose, nature and frequency of their visits; their opportunity for observation; the nature and subject matter of their conversations; the failure of the father to recognize them; together with all other facts and circumstances which they gave as a basis for their opinion.

The record also shows that in 1932 the father made a loan to his son, Anton, Jr., one of the plaintiffs, of $1,000. This loan the son paid back in 1935. At the same time the father made a loan to his son he made one to his daughter, Jennie McDonald, a plaintiff in this action, of $1,000. Up until 1934 the father carried an account in the Cicero State Bank in which he made deposits and on which he drew checks. A conservator or guardian was not appointed until December 30, 1936.

Our conclusion upon this phase of the case is that the evidence falls far short of adequate proof of lack of mental capacity to make the deed. "The rule of law is well settled that, to set aside a deed on the ground of want of mental capacity on the part of the grantor, it must be clearly established that the mind of the grantor was so weak or unbalanced at the time of the execution of the deed that he would not understand and comprehend the purport and effect of what he was then doing. *Clark v. Holmes,* 109 Neb. 213; *Schley v. Horan,* 82 Neb. 704; *West v. West,* 84 Neb. 169." *Blochowitz v. Blochowitz,* 122 Neb. 385, 240 N. W. 586.

The evidence discloses that the father and mother were strong individuals, both in body and mind. Although they were getting older in years and the mother was physically afflicted with diabetes, nevertheless, the court is fully satisfied that both had their mental faculties intact on August 29, 1933.

The next issue is the question of undue influence. Under

this issue the parties have discussed the question of who had the burden of proof. It can generally be said that undue influence is never presumed but that the one attacking an instrument on the ground that its execution was so procured has the burden resting on him to prove that fact.

"The fundamental principle is that the burden of proof in any cause rests upon the party who, as determined by the pleadings or the nature of the case, asserts the affirmative of an issue and remains there until the termination of the action." 20 Am. Jur., sec. 135, p. 138.

"The burden of proof in its proper sense rests, throughout the case, as to each issue, on the party originally having the burden as to such issue." *In re Estate of Hagan*, 143 Neb. 459, 9 N. W. 2d 794.

"The test for determining which party has the affirmative, and therefore the burden of establishing a case, is found in the result of an inquiry as to which party would be successful if no evidence at all were given, the burden being, of course, on the adverse party." 31 C. J. S., sec. 104, p. 711.

"In equity, as at law, the party who has the affirmative of an issue has the burden of proof as to such issue, and a plaintiff in equity has the burden of proving all allegations of his bill not admitted by the answer." 31 C. J. S., sec. 107, p. 717.

"It is a fundamental rule of pleading and evidence that a party pleading a material fact assumes the burden of proving it. *Allen v. Chicago, B. & Q. R. Co.*, 82 Neb. 726; *Pierce v. Miller*, 107 Neb. 851." *Gutzmer v. Nelsen*, 121 Neb. 214, 236 N. W. 614.

As stated in *Moore v. Williams*, 111 Neb. 342, 196 N. W. 695: " 'Confusion can, to a certain extent, be avoided, and apparent contradictions reconciled, by bearing in mind the distinction between "burden of proof" and "burden of evidence" * * * and also the fact that in the vast majority of cases any such distinction is entirely ignored by the courts. The general rule is that the burden of proof rests upon the party who has the affirmative of the issue, as determined by

the pleadings, * * * and as the rule as to burden of proof is a fixed rule of law, the burden never shifts from the party having the affirmative of the issue. * * * The test for determining which party has the affirmative, and therefore the burden of establishing a case, is found in the result of an inquiry as to which party would be successful if no evidence at all were given, the burden being of course on the adverse party.' 22 C. J. 67 *et seq.*"

"The ambiguity lies in the indiscriminate use of the phrase 'burden of proof,' as meaning either the necessity of establishing the existence of a certain fact or set of facts by evidence which preponderates to a legally required extent, or the necessity which rests on a party at any particular time during a trial to create a prima facie case in his own favor or to overthrow one when created against him." 31 C. J. S., sec. 103, p. 709.

However, we have held in cases to set aside deeds because of undue influence that when a presumption thereof arises by reason of the facts and circumstances of the particular transaction, that it places on the grantee the burden of proof to establish that no undue influence was exerted by him upon the grantor. See *Gibson v. Hammang*, 63 Neb. 349, 88 N. W. 500; *Chamberlain v. Frank*, 103 Neb. 442, 172 N. W. 354. In so far as these cases shift the burden of proof, we think they misconceive the effect of the presumption.

As stated in 20 Am. Jur., sec. 158, p. 161: " * * * a presumption may be defined as a rule of law that attaches definite probative value to specific facts or draws a particular inference as to the existence of one fact, not actually known, arising from its usual connection with other particular facts which are known or proved. It is the conclusion of law which the court draws of the existence of one fact from others already proved." "Presumptions form an important part of the law of evidence generally. During the trial of an action, the party who has the burden of proof upon an issue may be aided in establishing his claim or defense by the operation of a presumption, or, expressed differently, by

the probative value which the law attaches to a specific state of facts. A presumption may operate to relieve a party of the duty of presenting evidence until his adversary has introduced proof to rebut the presumption." 20 Am. Jur., sec. 157, p. 161.

"While it is often loosely said that a presumption shifts the burden of proof, cases distinguishing between the concepts of burden of proof, properly so called, and burden of evidence, or using the phrases in their precise meanings, hold that the position of the burden of proof, properly so called, is not affected by a presumption, but that a presumption shifts the burden of evidence." 31 C. J. S., sec. 111, p. 720.

" * * * at the beginning of every trial the burden of proof and the burden of evidence as to any particular issue are generally on the same party. This burden of evidence is so continued until the party having the burden of proof establishes a *prima facie* case; nothing less will shift the burden of evidence. When such a *prima facie* case is established, the burden of evidence is shifted to the adverse party; the adverse party may, by the production of evidence destroying the *prima facie* case against him, satisfy the burden and restore it to the original party." 31 C. J. S., sec. 110, p. 718.

"The burden of evidence at any particular time rests on the party who would be defeated if no further evidence were introduced; when a *prima facie* case is established, the burden of evidence is shifted to the adverse party, and the burden may shift from side to side during the course of the trial." 31 C. J. S., sec. 110, p. 718.

The burden of proof means the duty resting on one party or the other to establish by a preponderance of the evidence an issue essential to his recovery. In this sense the burden of proof never shifts nor changes but remains from the first to the last where it is placed by the pleadings or the substantive law of the case.

The plaintiff may offer sufficient proof to make a *prima facie* case, or he may be aided by a presumption of law which, if nothing further appeared, would entitle him to a

judgment, and when this happens the burden of evidence to meet this *prima facie* case devolves upon the adverse party.

By this distinction of the proper relation between "burden of proof" and "burden of evidence" we in no way limit or restrict the presumption of undue influence that arises when sufficient facts and circumstances are established from which it flows. See *Bennett v. Bennett*, 65 Neb. 432, 91 N. W. 409; *Gibson v. Hammang, supra; Chamberlain v. Frank, supra; Scott v. Swank*, 132 Neb. 720, 273 N. W. 25; *Wixson v. Nebraska Conference Ass'n.*, 122 Neb. 771, 241 N. W. 532. As stated in *Gidley v. Gidley*, 130 Neb. 419, 265 N. W. 245: "Generally, the one attacking an instrument on the ground that its execution was procured by undue influence has the burden resting on him to establish that fact, but the circumstances under which a conveyance is made, the condition of the grantor at the time, and the injustice to him and his heirs, if it is upheld, may be such as to cast upon the grantee the burden of (evidence) showing that it is untainted with undue influence, imposition or fraud, but is the intelligent and deliberate act of the grantor."

Therefore, when a party seeking to set aside a conveyance because of undue influence establishes facts which show the relationship of the parties and their dealings to be such that a presumption of undue influence arises therefrom, the burden then shifts to the party seeking to sustain such conveyance to introduce evidence to overcome such presumption and in the absence thereof a decree should be entered against him.

It is impossible to lay down any hard and fast rule in cases of this kind as to when a presumption of undue influence arises. The rule must of necessity be applied according to the particular facts and circumstances of each case in which the question arises. It may generally be stated that if the facts and circumstances of a case show such a confidential, fiduciary or trust relation that it would be inequitable to sustain the deed in question then such presumption arises and the burden of going forward with the

evidence rests upon the grantee to show the bona fides thereof.

In determining whether or not the plaintiffs have established sufficient facts and circumstances, considering the relationship of the parties, to raise a presumption of undue influence, and, if so, whether the defendants have rebutted it, the court will examine the transaction with care and closely scrutinize everything done by the donees to secure the deed in question. See *Bennett v. Bennett, supra; Scott v. Swank, supra; Broeker v. Day,* 124 Neb. 316, 246 N. W. 490; *Winslow v. Winslow,* 89 Neb. 189, 130 N. W. 1042.

In considering the facts we should bear these legal principles in mind:

"The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor." *Gidley v. Gidley, supra.*

"In case of a gift or voluntary conveyance from parent to child, no presumption of fraud or undue influence arises, as between the parties thereto, from the mere fact of the relation. * * * ." *Broeker v. Day, supra.*

" 'The affection, confidence and gratitude of a parent to a child which inspires the gift is a natural and lawful influence, and will not render it voidable, unless this influence has been so used as to confuse the judgment and control the will of the donor.' *Hacker v. Hoover,* 89 Neb. 317." *Little v. Curson, supra.*

"Although mental weakness may fall short of entire incompetency to transact business, if it is taken advantage of to procure a conveyance by inequitable means, the conveyance may be set aside." *Bennett v. Bennett, supra.*

While some of the evidence is in conflict, we find it discloses: That after the Kucaba, Sr., family moved from Tobias back to Chicago and then to Cicero, they lived in Cicero until both parents passed away. After their return the father did not engage in any business but up until 1927 did buy and sell some real estate. Judging from the extent of his property the father was apparently a successful business man and, although he raised a large family, was able to

save considerable. As the family grew up they married and left home, Edward doing so in 1925. However, in 1930 he returned a divorcé and continued to live at home. The daughter, Mrs. Koranek, was living with the parents at this time and continued to remain until the fall of 1931. After she left the three, the mother, father and Edward, lived there by themselves until in June of 1932 when Edward and Frances were married. At the parents' request she came into the home. The mother was afflicted with a diabetic condition and was unable to take care of her home, being up and down as her physical condition permitted.

Frances took complete charge of the household duties and the care of the parents, particularly the mother who needed considerable individual attention. Although the father assisted her in a small way she did everything necessary and seemed to completely satisfy the parents. While she could not talk Bohemian she could understand it and was able to get along with the parents very well. At the mother's direction she learned to cook Bohemian dishes. She continued to take care of the household and the mother until the latter passed away. She then continued to keep the home for the father until he went to live with one of his daughters in 1938. About six months after he went to live with his daughter the father returned to Edward's home at 5045 25th Place for a period of six or seven weeks. He was then taken to a hospital for about ten days when Edward brought him back to his home where he stayed until he passed away.

When Edward came back to the family home in 1930, they lived at 5009 25th Street in Cicero, and he remained in their home until he moved to 5045 25th Place in 1938. At the time he came back to the parents' home in 1930 he was employed in a "bookie" establishment and continued in that capacity until 1936 when he started working for the city of Cicero. Incidentally, it appears that the father was a great fan of horse racing. He liked to bet on the races and continued to do so long after 1933.

The deed in question was prepared on or about August

29, 1933. Although the evidence does not disclose who drew the deed, presumably Edward either prepared it or had it prepared. Edward called Anton Maciejewski, a notary, who was a personal friend of his and of the parents, to witness and acknowledge its execution. This notary had purchased the father's coal business in 1917 and at the time of the taking of his deposition he was a United States congressman from the sixth Illinois district. He came to the home and the deed was there signed by the parents. He witnessed and acknowledged it. It was then recorded in Saline county on September 1, 1933. In May of 1934, just after their mother's death, Edward had a conversation about the deed with Anton, Jr., in front of the latter's office. Again, in the latter part of July or the forepart of August, 1936, in the office of Anton, Jr., in the presence of Anton, Jr., Mrs. Werth, Mrs. Topel, Mrs. Meyers, Mrs. Koranek, Mrs. McDonald and Mrs. Baumruker and while they were discussing their father's affairs, Edward told them the parents had deeded him the farm in Nebraska. At the time of taking a deposition in 1941, the deed in question was produced. It is apparent that no effort was made to conceal the conveyance from the children or, during their lifetime, from the parents, nor to destroy it.

Dr. Arnold C. Blattspieler of Tobias, Nebraska, who had become a friend of the Anton Kucaba, Sr., family, including Edward, when they lived at Tobias, visited in the parents' home in February of 1934. At that time the mother was in bed as a result of her diabetic condition but she was mentally all right. While they were having a conversation in which they were discussing her condition and then their property holdings at Tobias, she told him they had given Edward the farm which the deed conveys.

At the time the farm in question was conveyed to Edward and Frances the father owned in addition thereto another quarter section of land in Saline county; a quarter section in Thayer county; 80 acres near Black River Falls, Wisconsin; a two-flat brick building at 5009 West 25th Street, Cicero, Illinois, in which they lived; five and one-half va-

cant lots adjoining the flat; and $12,600 in notes and mortgages.

From all the evidence we conclude that the deed was a gift from the parents to their son and daughter-in-law of a part of their property; that in view of their relationship it was a natural act of the parents; that they had their mental faculties fully intact; that it was their voluntary act done with full knowledge and something which they had full right and privilege to do. Therefore, the judgment of the lower court is affirmed.

AFFIRMED.