VIVIAN MILLER, PERSONAL REPRESENTATIVE OF THE ESTATE OF ERVIN FOSTER GETTY, DECEASED, APPELLANT, V. JEFFREY LEE WESTWOOD ET AL., APPELLEES.

472 N.W.2d 903

Filed August 16, 1991.   No. 89-228.

Rodney P. Cathcart, of Erickson & Sederstrom, P.C., and Gordon B. Fillman, of Fillman & Brugh, for appellant.

Steven E. Guenzel, of Barlow, Johnson, DeMars & Flodman, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Plaintiff, Vivian Miller, the guardian and conservator of Ervin Foster Getty, appeals the judgment of the district court denying her request to set aside an installment contract for the sale of farmland executed by Getty on December 9, 1986, prior to Miller's appointment as guardian and conservator. Getty died on November 1, 1990, during the pendency of this appeal,

and the action was revived by Miller as personal representative of Getty's estate.

This action was filed on July 20, 1987. In her amended petition filed September 2, 1988, Miller prayed that the land contract be declared void because (1) Getty lacked the mental capacity to handle his business affairs and had been defrauded by the defendants-appellees, Jeffrey Lee Westwood, Don Westwood, and Donna Westwood, and (2) the contract was the product of undue influence exerted by the defendants upon Getty. Miller asked that the court declare a constructive trust upon the farm proceeds for the year 1987 for the benefit of Getty.

This action is one in equity. In an appeal of an equity action, this court reviews the record de novo, subject to the rule that where credible evidence is in conflict on material issues of fact, this court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988). See Neb. Rev. Stat. § 25-1925 (Reissue 1990).

The record shows that Getty was born on August 16, 1907, grew up on the farm that was the subject of the contract in this case, served in the military, earned a master's degree, and taught school in Detroit, Michigan, for over 30 years. He never married. His closest relatives at the time of the execution of the contract in this case were an older brother, an older sister, a niece, and four nephews. Getty purchased the farm from his father's estate in 1946 and returned to the farm in 1965, when he retired from teaching in Michigan. Getty worked as a substitute teacher in Nebraska until 1970.

The farm in question is legally described as the northwest quarter of Section 21, Township 11 North, Range 1 West of the 6th P.M., in York County, Nebraska, and is located 1 mile east and one-half mile north of Waco, Nebraska. It is a full quarter section consisting of 160 acres, including 133.9 acres of cropland irrigated with a 75-horsepower electric motor and approximately one-half mile of 8-inch gated irrigation pipe.

Defendants Don and Donna Westwood are husband and wife and are the parents of defendant Jeffrey Westwood. Don

Westwood started farming a few acres of Getty's land in 1954. The Westwoods have farmed the entire quarter section since 1963, leasing the land on a crop share basis. Jeffrey Westwood participated in the farming operation on the Getty land from the time he was a child. Getty helped the Westwoods with the irrigation work on the farm until 1984.

Prior to December 9, 1986, Don Westwood (hereinafter Westwood) and Getty engaged in several conversations regarding the sale and purchase of the Getty farm. Westwood testified that he first thought about buying the farm from Getty 10 to 15 years ago, but that Getty "put [him] off" until 1986. In 1986, Getty received an award commemorating the fact that the farm had been owned by the Getty family for 100 years.

In the summer of 1986, while Getty and Westwood were irrigating on the farm, Getty told Westwood that he had received his 100-year plaque. During this conversation, Westwood asked if Getty would be interested in selling the farm on a contract. According to Westwood, Getty "set there for a while" and asked what it included. Westwood said he did not know and that he had never seen a land contract. According to Westwood, Getty finally said he would like to see a contract and that he did not care who prepared the contract.

As a result of this conversation, Westwood asked his attorney, John Hahn, to draft a contract. Hahn testified that Westwood asked him to prepare the contract shortly before December 9, 1986. Westwood did not know the purchase price or interest rate, but told Hahn that the seller wanted to retain a life use on the building site. Hahn prepared a "Real Estate Purchase Agreement." Hahn had the agreement typewritten before he first met Getty. From directions given by Westwood, Hahn prepared the instrument with Getty as the seller and Jeffrey Westwood as the buyer. Blanks for the various terms were left in the agreement. Apparently from information furnished by Westwood, Hahn used a form that did not provide for any downpayment. Donna Westwood testified that the Getty farm was to be purchased in Jeffrey Westwood's name to keep it "out of the hands of the FHA."

On December 9, 1986, Hahn, Jeffrey Westwood, Westwood, and Donna Westwood met with Getty, who was then 79 years

old, at Getty's farm to discuss the terms of the agreement. Donna Westwood secretly tape-recorded the December 9 meeting "for historical purposes."

Hahn testified that he, Getty, and the Westwoods gathered around Getty's kitchen table and developed the terms of the contract as follows: Westwood and Getty first discussed what would be a fair price. Getty asked Westwood what he was willing to pay, and Westwood said he could not tell Getty that price. The discussions continued, and Westwood basically emphasized the amount of the rental payments made by him to Getty during previous years. That figure was approximately $6,000 per year, and the parties arrived at a purchase price based on the $6,000 figure. Westwood testified that in negotiating the contract payments, he told Getty he basically wanted to make the rent, at the level he had paid over the years, pay for the farm and that Getty was satisfied with that arrangement.

The record shows that the interest rate was negotiated during the December 9 meeting as follows:

[Hahn]: What interest rate do you want to charge?

[Getty]: (laughing) What are some of the interest rates.

Don [Westwood]: I can't, I can't do that, Ervin.

[Getty]: I ask 'em at the bank often enough.

Donna [Westwood]: Four, four and three-quarters, I thought . . .

[Getty]: Oh, let's make it come out even. Four. Let's don't go for three-quarters.

. . . .

. . . Teachers like numbers to come out even . . . .

Getty was not represented by an attorney at the December 9 meeting. He was given a copy of the contract, but did not read through it at any time during the meeting. Hahn testified that he asked Getty if he wanted to read the contract before he signed it, and Getty said he did not. Hahn also asked Getty whether he wanted his attorney to review the documents before execution. Again, Getty said he did not.

Hahn testified that he calculated the $60,000 purchase price based on the figures proposed at the December 9 meeting. The resulting purchase agreement provided that the sale price of the

farm and certain irrigation equipment was $60,000, at interest of 4 percent, with level principal payments of $2,000 for 30 years. Westwood agreed to pay the property taxes on the farm, which were approximately $2,200 per year. Getty retained a life estate in the buildings on the farm. Westwood testified that the contract did not provide for a downpayment because Getty would have had "double income" for 1986 in that Westwood had paid Getty for his share of the 1986 corn crop about 2 weeks prior to December 9, 1986.

The tape recording of the December 9 meeting corroborates the above testimony.

The record shows that the fair market value of the farm and irrigation equipment on December 9, 1986, was between $147,000 and $176,000. Hahn testified that under the terms of the contract, the Westwoods would pay basically the same amount (approximately $6,000—$2,000 applied toward principal and $4,000 in taxes and interest) that they had paid in rent the previous year for the next 30 years and then they would own the farm. Hahn "thought the interest rate was probably pretty low" and acknowledged that land contracts were running between 8 and 9 percent, and possibly at 10 percent interest.

On January 15, 1987, Getty met the Westwoods and Hahn in Hahn's York office to close the deal. During this meeting, a memorandum of sale, escrow agreement, and deed were executed, and the abstract was delivered by Getty. Getty was not represented by an attorney at this meeting.

The record shows that prior to December 9, 1986, and January 15, 1987, Getty was, in the words of the trial court, "an intelligent, energetic, enthusiastic, garrulous, domineering, opinionated, independent, eccentric person." We agree with that assessment.

Getty's older brother, Hayward Getty, testified that some time in 1986, Getty mentioned the subject of the Westwoods' renting the farm. Specifically, Getty told Hayward Getty he did not think he was getting proper rental income from the farm and said that "Don Westwood was a crook." Hayward Getty then testified that his brother was not particularly upset, and observed that Getty was not "noted for his business acumen and loosing [sic] a few dollars here and there never bothered

him." In a conversation regarding the sale of the farm, Getty told Hayward Getty that the people in Waco thought he sold it too cheaply. In the spring of 1987, referring to the land contract, Getty repeated the statement he made a year before about Westwood being a crook. As to why he sold the farm at that price, Getty "did say that that was the only way that Jeffrey would ever get a farm."

On December 10, 1986, while in the bank at Waco, Nebraska, Getty told Frederick Scheele, a longtime friend, that he had sold his farm to Jeffrey Westwood because he wanted him to have it.

Marion "Spike" Sjolander, manager of the Waco branch of the First National Bank of York, where Getty did most of his banking, testified that Getty had discussed the sale of his farm to the Westwoods for a number of years. According to Sjolander, Getty did not discuss the price of the farm but said he hoped the Westwoods could buy it. Westwood's brother, Lynn Westwood, testified that Getty told him many times that he wanted Jeffrey Westwood to be a farmer and own the Getty farm.

William Heine, a neighbor and friend of Getty's, testified that he reviewed the contract with Getty in December 1986 at Getty's request. Heine did not recall that the contract was signed, but noted that the blanks had been filled in. Getty asked Heine if "people in town would think he was crazy for doing this" and Heine asked him "if he cared and he said no." Heine assumed Getty was talking about the price and the interest rate. Getty told Heine that if Getty were to put the farm up for auction it would probably bring $1,000 per acre. The two men also discussed the fact that Jeffrey Westwood was the buyer. According to Heine, Getty said he wanted Jeffrey Westwood to have the farm because he was young and Getty did not want the farm to change hands again for a while. Getty also approved of the way the Westwood family had farmed the land. Heine testified that Getty stated on that day and on previous occasions that he had no one in his family who he wanted to have the farm. Getty also said he was selling the farm partly because he did not want to manage his own financial affairs any more.

Several witnesses testified to the fact that in recent years

Getty allowed young people to live with him on the farm, and the record shows that Getty provided substantial financial assistance to two of these persons, Shannon Hamilton and Carla Smith, during the first half of 1987. Miller testified that when she talked to Getty about these people, he told her they were his friends. Heine testified that he did not approve of Hamilton's living at the farm because he "and the rest of the crew out there" were taking advantage of Getty. Heine expressed his concerns to Getty about a year before Getty sold the farm. According to Heine, "He just flat out told me it was none of my business how much money he gave them or that he had them live there." Getty told Heine he could afford it and went into some detail about how he hoped he was doing those people some good. He thought he could possibly change their lives, and if he did improve their lives, it was worth it.

The medical evidence shows that Getty was in poor physical health at the time he sold the farm. Dr. Darroll Loschen, Getty's physician, testified that he had treated Getty since 1965. In 1979, Loschen diagnosed Getty as being diabetic. The diabetes was controlled with insulin until August 17, 1985, when Getty was admitted to the York hospital for problems related to diabetes. He was released 2 days later, having improved significantly.

Dr. Loschen next saw Getty in February 1987, when Getty's diabetes was "under extremely poor control." Getty had a dry mouth, increased urinary frequency, and blurred vision. He had gained 25 pounds in 18 months and was not in very good condition.

On April 3, 1987, Getty was once again admitted to the York hospital with his diabetes out of control. He was discharged from the hospital on April 6. Getty returned to the clinic on April 20 with similar symptoms. On this occasion, Getty appeared confused, and Dr. Loschen diagnosed an acute organic brain syndrome. A diagnosis of organic brain syndrome means that due to his disease processes, Getty was not relating to either time, place, person, or all three. Dr. Loschen referred Getty to Dr. George Hachiya, a consulting psychiatrist, who examined Getty on April 20.

Dr. Hachiya's report of April 20, 1987, states:

Mr. Getty is a 79 year old gentleman seen for psychiatric evaluation at the York community hospital on April 20th.

Mr. Getty has several physical illnesses. . . .

In this interview session Mr. Getty presents himself as a robust energetic man who does not appear to be of his chronological age. He verbalizes with good use of language. There is definite pressure of speech. There is, however, no indication of loose association or flight of ideation.

. . . .

Assessment of his sensorium and mental capacity reveals him to be remarkably alert in view of his chronological age. There is, however, significant impairment of insight and judgment.

Dr. Hachiya recommended that Getty be transferred to the geriatric unit of the St. Joseph Center for Mental Health in Omaha. Getty agreed to the transfer and was admitted on April 21, 1987, under the care of Dr. Subhash Bhatia.

The results of Dr. Bhatia's mental status examination are as follows:

ATTENTION, APPEARANCE, ATTITUDE & ACTIVITY: The patient was alert, he appears appropriately dressed, tall, overweight and younger than his stated age. He maintained good eye contact and was cheerful, friendly and cooperative throughout the interview. He exhibited a normal amount of motor activity with no evidence of retardation, posturing, mannerisms or ticks. . . . THOUGHT PROCESSES: The patient was coherent, spontaneous but overproductive. His speech was somewhat pressured and tangential. . . . EMOTIONAL STATE: The patient appeared moderately elated on a seven point depression-elation scale. He was freindly [sic] and very animated throughout the examination. His affect was within normal range and appropriate to his thought content throughout the interview. SENSORIUM AND INTELLIGENCE: The patient was oriented to person, place and time. He had excellent recall of up to six digits forward. He had adequate simple mathematical ability but was unable to

name the last five presidents in order, but he did name five presidents from this century. He then asked the examiner which four presidents had been assasinated [sic] and was able to name these.

Getty was then referred to Dr. Jerrad Hertzler for a neurological examination. After examining Getty on May 7, 1987, Dr. Hertzler described him as a normally developed elderly man who was "quite alert" and "perfectly well oriented."

Getty was discharged from the St. Joseph Center for Mental Health on May 21, 1987, and was admitted to Hearthstone, a care facility in York. Soon thereafter, Hayward Getty filed a petition in the county court for York County, seeking to have Miller appointed guardian and conservator for the protection of the person and the estate of Getty. Hayward Getty testified that he filed the petition to comply with Hearthstone's requirement that a guardian be appointed for Getty. Miller was so appointed on June 15, 1987.

Dr. Loschen acknowledged that he had not seen Getty between August 1985 and February 1987. Based on what Getty was like in August 1985 and his condition in February 1987, however, Dr. Loschen was of the opinion that Getty's ability to enter into a contract on December 9, 1986, "would be an open question." He also noted that Getty's various health problems could have triggered or exacerbated organic brain syndrome during the period in question, but did not testify that Getty was incompetent in December 1986.

Dr. Eli Chesen, a psychiatrist, did not personally examine Getty, but reviewed the medical records of Dr. Loschen, the medical records of the St. Joseph Center for Mental Health, the York hospital records, and the tape recording of the December 9, 1986, meeting. In his deposition, taken October 5, 1988, Dr. Chesen expressed the opinion, based on a lack of medical evidence to the contrary, that Getty was able to understand the events that took place on December 9, 1986. Dr. Chesen believed that Getty did not suffer an impairment to the degree that he would have been incompetent to protect his own interests on December 9, 1986, and that he comprehended the meaning, effect, and design of his actions on that date.

After reviewing the same materials and a copy of Dr. Chesen's deposition, Dr. John Baldwin, a psychiatrist, concluded that Getty suffered from organic affective disorder, which is similar to organic brain syndrome. Dr. Baldwin was of the opinion that on December 9, 1986, Getty was competent to know that he was selling his farm, but was not competent, or did not have a sufficient understanding of his own best interests, to properly attend to the details of the transaction. In other words, Getty did not understand or was not competent to understand the financial implications of the sale and the impact of those implications upon him.

In his deposition, taken November 14, 1988, Getty himself recalled that the Westwoods "showed up with a contract," that the Westwoods wanted to buy just the land, and that he wanted to keep the house and buildings. Getty had "no idea" of how they determined the contract price or the interest rate. He stated that he did not know what the farm was worth, but did not think his farm could sell for $1,000 per acre "unless somebody wanted to get rid of their money and put it into something safely." He believed the farm had to be sold sometime "because I am 81 years old, and something had to be done with it sooner or later. I didn't want to die and just leave it all up in the air . . . ." He described Jeffrey Westwood as a "good boy" and said he "sort of" wanted the Westwoods to have the farm because they had farmed it for a long time.

Getty denied being mentally incompetent when he signed the contract. He did not inquire into the real estate values around York County, but was willing to sell the farm without knowing what it was worth. He was satisfied with the price because he did not really need the money due to his pension payments.

Getty believed the Westwoods took advantage of him because they thought he did not need the money, but that the Westwoods did not force or urge him to do something he did not want to do. He said it did bother him at the time that there were four of them and only one of him at the house. He was suspicious that the Westwoods hired a Lincoln lawyer when there were good lawyers in York. Nevertheless, Getty said he did not feel any need to discuss the matter with his own attorney.

Regarding Getty's mental capacity, the district court found that Getty understood on December 9, 1986, and on January 15, 1987, he was selling the farm to Jeffrey Westwood; that Getty did not know, but did not care, what the value of the farm was; and that all amounts of fair market value over $60,000 were intended as a gift to Jeffrey Westwood. The district court also found that Miller failed to prove by clear and convincing evidence that Getty completed the sale as the result of undue influence. Accordingly, Miller's petition was dismissed.

In summary, Miller's assignments of error allege that the trial court erred (1) in finding the evidence did not establish that Getty was mentally incompetent to enter into the real estate transactions of December 9, 1986, and January 15, 1987, (2) in finding that the execution of documents on those dates was not the product of undue influence exercised upon him by the defendants, and (3) in finding that Miller did not meet the burden of proof to set aside a gift.

In an action to set aside a contract on the basis of incapacity or undue influence, the plaintiff has the burden of establishing the elements of those theories by clear and convincing evidence. See *Craig v. Kile*, 213 Neb. 340, 329 N.W.2d 340 (1983).

We have said that

"[i]n order to set aside an instrument or instruments . . . for want of mental capacity on the part of the person executing such instruments, the burden of proof is upon the party so asserting to establish that the mind of the person executing such instruments was so weak or unbalanced when the instruments were executed that he could not understand and comprehend the purport and effect of what he was doing."

*Craig v. Kile, supra* at 346, 329 N.W.2d at 344. See, also, *Kucaba v. Kucaba*, 146 Neb. 116, 18 N.W.2d 645 (1945); *Conry v. Langdon*, 181 Neb. 53, 146 N.W.2d 782 (1966).

Citing *Kucaba v. Kucaba, supra*, Miller contends the district court erred in requiring that she prove by clear and convincing evidence that Getty was mentally incompetent to execute the documents in question. In *Kucaba v. Kucaba, supra* at 125, 127, 18 N.W.2d at 650-52, we said:

"The fundamental principle is that the burden of proof

in any cause rests upon the party who, as determined by the pleadings or the nature of the case, asserts the affirmative of an issue and remains there until termination of the action." [Citation omitted.]

"The burden of proof in its proper sense rests, throughout the case, as to each issue, on the party originally having the burden as to such issue." [Citation omitted.]

. . . .

". . . [A]t the beginning of every trial the burden of proof and the burden of evidence as to any particular issue are generally on the same party. This burden of evidence is so continued until the party having the burden of proof establishes a *prima facie* case; nothing less will shift the burden of evidence. When such a *prima facie* case is established, the burden of evidence is shifted to the adverse party; the adverse party may, by the production of evidence destroying the *prima facie* case against him, satisfy the burden and restore it to the original party." [Citation omitted.]

"The burden of evidence at any particular time rests on the party who would be defeated if no further evidence were introduced; when a *prima facie* case is established, the burden of evidence is shifted to the adverse party, and the burden may shift from side to side during the course of the trial." [Citation omitted.]

The burden of proof means the duty resting on one party or the other to establish by a preponderance of the evidence an issue essential to his recovery. In this sense the burden of proof never shifts nor changes but remains from the first to the last where it is placed by the pleadings or the substantive law of the case.

Based on the foregoing, Miller contends that she established a prima facie case that Getty was mentally incompetent when he sold his farm to the Westwoods and that the Westwoods failed to produce sufficient evidence to "destroy" Miller's prima facie case, satisfy the Westwoods' burden to go forward with the evidence, and restore the burden of evidence to Miller. We disagree.

Although Miller did establish a prima facie case on the issue of Getty's competency, the evidence presented by the Westwoods was sufficient to overcome the prima facie evidence that Getty was mentally incompetent when he sold his farm to Jeffrey Westwood. As the trial court observed, the medical evidence on this issue is an open question. The other evidence shows that Getty understood that he was selling his farm to Jeffrey Westwood. It also shows that Getty did not know, *but did not care*, what his farmland was worth, because he intended to sell the farm to Jeffrey Westwood at a price the Westwoods said they could afford. Accordingly, we find that Miller failed to prove by clear and convincing evidence that Getty was mentally incompetent when he sold his farm to the Westwoods.

The various factors and elements necessary to establish a case of undue influence are set out in *Craig v. Kile*, 213 Neb. 340, 345-46, 329 N.W.2d 340, 344 (1983):

> " ' "The elements necessary to be established to warrant the rejection of a written instrument on the ground of undue influence are: (1) That the person who executed the instrument was subject to undue influence; (2) that there was opportunity to exercise undue influence; (3) that there was a disposition to exercise undue influence for an improper purpose; and (4) that the result was clearly the effect of such undue influence." ' "

It is not mere influence that makes a conveyance unlawful, but undue influence as established in the law. *Craig v. Kile, supra*. For example, the undue influence which will void a gift is an unlawful and fraudulent influence which controls the will of the donor. *Id*.

> " 'The court, in examining the matter of whether a deed was procured by undue influence, is not concerned with the rightness of the conveyance, but only with determining whether it was the voluntary act of the grantor. The fact that the grantor has others who are proper subjects to receive his bounty can be considered by the court only as it bears upon the validity of the conveyance.' " [Citation omitted.] The mere fact that there are living relatives who are denied property in favor of friends is not sufficient to set aside a conveyance. . . . [M]ere suspicion, surmise, or

> conjecture does not warrant a finding of undue influence, but there must be a solid foundation of established facts on which to rest the inference of its existence. This is particularly true where the parties are well aware of the existence of the contested deed shortly after its execution.

*Id.* at 346-47, 329 N.W.2d at 344-45.

As the trial court observed, the evidence shows that the defendants had the opportunity and "had some profit motive for 33 years" to influence Getty. As discussed above, Getty was an intelligent man and had always been independent in his thinking. The medical evidence is inconclusive as to whether he was susceptible to influence by the Westwoods and others because of his medical problems. Getty himself believed the Westwoods took advantage of him, but said that the Westwoods did not force or urge him to do something he did not want to do. Reviewing the record de novo, we find that any influence exercised by the Westwoods did not rise to the level of undue influence and that the sale of the farm at those terms was Getty's voluntary action. Miller's assignments of error in this regard are without merit.

Finally, Miller contests the trial court's finding that "[a]ll amounts of fair market value over $60,000 . . . were intended as a gift to Jeffrey Westwood because Mr. Getty thought that his estate, after the sale, [was] more than ample to provide for his needs for the rest of his life and there is no evidence to the contrary." This case was tried on the premise that the sale of the farm was an arm's-length transaction. At no time in the Westwoods' case or in the pleadings was the concept of a gift ever mentioned. Although the trial court's finding in this regard might explain Getty's motive in selling the farm as he did, it was unnecessary to make such a finding in order to dispose of the issues presented in the case. Accordingly, we modify the trial court's order to delete the language quoted above.

In closing, we note that although he was present at the meetings on December 9, 1986, and January 15, 1987, Jeffrey Westwood, the actual buyer, essentially took no part in the negotiation of this purchase. Although Don and Donna Westwood appear to be the parties most interested in buying Getty's farm, the land actually belongs to their son, Jeffrey

Westwood, as Getty wished.

The decision of the district court is affirmed as modified.

AFFIRMED AS MODIFIED.